IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**FILED**

KARLA KNORR : CIVIL ACTION

FEB 2 6 2013

v.

MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk

MICHAEL J. ASTRUE : NO. 11-7324

## REPORT AND RECOMMENDATION

ELIZABETH T. HEY, U.S.M.J. February 25, 2013

This action was brought pursuant to 42 U.S.C. § 405(g) to review the final

decision of the Commissioner of Social Security ("Commissioner" or "Defendant"),

denying the application filed by Karla Knorr ("Plaintiff") for disability insurance benefits

("DIB") under Title II of the Social Security Act. For the reasons that follow, I conclude

that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial

evidence. Therefore, I recommend that this matter be remanded for further proceedings

pursuant to sentence four of 42 U.S.C. § 405(g).

## I.    **PROCEDURAL HISTORY**

Plaintiff filed for DIB on March 26, 2010, alleging disability as of October 6,

2009, based on physical and mental disorders.[1] Tr. at 13, 169-70, 196. The application

was denied initially and Plaintiff requested an administrative hearing. Id. at 139-40. On

---

[1] Plaintiff filed a prior DIB claim which was denied on October 5, 2008, when the
ALJ found that Plaintiff was capable of a range of light exertion work. Tr. at 93-103.
The Appeals Council denied Plaintiff's request for review of that prior determination. Id.
at 113-15. Plaintiff does not contest the prior determination, and alleges for purposes of
the present DIB application that she became disabled on October 6, 2009. See Doc. 10 at
3. For purposes of the present DIB claim, Plaintiff's last date insured is December 31,
2011. See tr. at 174.

March 14, 2011, an ALJ held a hearing to consider the matter de novo. Id. at 53-89. In a decision dated April 12, 2011, the ALJ denied Plaintiff's claim. Id. at 10-23. On September 21, 2011, the Appeals Council denied Plaintiff's request for review. Id. at 1-5. Therefore, the decision of the ALJ is the final decision of the Commissioner. 20 C.F.R. § 404.981.

Plaintiff commended this action on November 25, 2011, and submitted a Motion for Summary Judgment and Brief and Statement of Issues in Support of Request for Review on March 13, 2012. See Doc. 10. Defendant responded on April 16, 2012. See Doc. 12.[2] The Honorable Paul S. Diamond referred the matter undersigned for a Report and Recommendation. See Doc. 13.

## II.    LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); Richardson v. Perales, 402 U.S. 389, 401 (1971); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate," and must be "more than a mere scintilla." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 118 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir.)). The court has

---

[2]Documents 11 and 12 were filed on the same day and appear to be identical, albeit captioned differently on the docket.

plenary review of legal issues. Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431

(3d Cir. 1999) (citing 42 U.S.C. § 405(g)).

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last . . . not less than twelve

months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process,

evaluating:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;

3. If so, whether, based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

4. If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity to perform his past work; and

5. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Allen v. Barnhart, 417 F.3d 396, 401 n.2 (3d Cir. 2005) (quoting Sykes v. Apfel, 228

F.3d 259, 262-63 (3d Cir. 2000)) (internal citations omitted); see also 20 C.F.R.

§ 404.1520(a)(4). Plaintiff bears the burden of proof at steps one through four, while the

burden shifts to the Commissioner at the fifth step to establish that the claimant is capable

3

of performing other jobs in the local and national economies, in light of her age, education, work experience, and residual functional capacity. Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

## III.   FACT RECORD AND THE ALJ'S DECISION

Plaintiff was born on August 4, 1969, and thus was 40 years of age at the time of the alleged onset of his disability, and 41 years of age at the time of the ALJ decision under review. Tr. at 169. She graduated from high school and attended two years of college. Id. at 197. She lives with her fiancé and her young daughter. Id. at 59, 62. Plaintiff has past relevant work as a night club dancer, deli clerk, cashier checker, and data entry clerk. Id. at 83, 198.

### A.   Physical Complaints

Plaintiff began treating with chiropractor Tamara Goss, D.C., in 2006, and was noted to have a history of physical complaints including a cervical spine disorder, a seizure disorder, bilateral knee problems, and migraine headaches. Tr. at 794-808. The record indicates office visits between November 2006 and January 2010, during which Plaintiff was treated with cervical spinal manipulation. Id. at 799-804.

On September 17, 2007, Plaintiff was first diagnosed with cervical dystonia[3] by Madhavi Gupta, M.D., whose impressions of Plaintiff at that time also included migraine without aura, chronic daily headache, epilepsy, and cervical radiculopathy. Tr, at 586.

---

[3]Dystonia refers to distortion or impairment of voluntary movement caused by disordered muscle tonicity. Dorland's Illustrated Medical Dictionary, 32nd ed. (2012) ("DIMD"), at 582.

4

Dr. Gupta repeatedly diagnosed Plaintiff with cervical dystonia in subsequent visits. Id. at 571, 573, 576, 578-86.

In January 2008, Plaintiff underwent a discectomy and fusion surgery for her cervical neck impairment. Tr. at 364-65. On June 12, 2009, Dr.Gupta noted that Plaintiff's neck and shoulders were "very tender and dystonic," and observed dystonia of the upper trapezius muscles and neck bilaterally. Id. at 578. On August 19, 2009, the doctor noted increased muscle contraction of the upper trapezius muscles bilaterally. Id. at 576. On October 1, 2009, Dr. Gupta injected Plaintiff with Myobloc[4] in her upper trapezius muscles and bilateral subscapular areas. Id. at 575.

On April, 28, 2010, treatment notes from Bezarel Banadda, M.D., an internal medicine specialist, list Plaintiff's diagnoses as migraine headaches, fibromyalgia and chronic pain. Tr. at 409. Dr. Banadda noted that Plaintiff needed prescription refills pending treatment with a new neurologist. At the time of the office visit, Dr. Banadda noted Plaintiff's prescriptions at the time included Celebrex,[5] Imitrex,[6] Depakote,[7]

---

[4]Myobloc injections are indicated for the treatment of patients with cervical dystonia to reduce the severity of abnormal head position and neck pain. Physician's Desk Reference, 62nd ed. (2008) ("PDR 2008"), at 3118.

[5]Celebrex is indicated for the treatment of osteoarthritis and rheumatoid arthritis. Physician's Desk Reference, 63rd ed. (2009) ("PDR 2009"), at 2981.

[6]Imitrex is indicated for the acute treatment of migraine headaches with or without aura in adults. PDR 2008 at 1469.

[7] Depakote is indicated for the treatment of the manic episodes associated with bipolar disorder. PDR 2009 at 424. "A manic episode is a distinct period of abnormality and persistently elevated, expansive, or irritable mood." Id. "Typical symptoms of mania include pressure of speech, motor hyperactivity, reduced need for sleep, flight of

5

Oxycodone[8] and Ambien.[9] Id.

On June 14, 2010, Dr. Goss noted that Plaintiff had participated in physiotherapy, water exercise programs, pain management programs, home exercises, and medication. Tr. at 798. Upon examination and evaluation, Plaintiff exhibited "decreased and painful cervical range of motion in all directions worse on the left side." Id. at 798. On November 3, 2010, Michael Stanley, M.D., advised Ruth Arnold, D.O., Plaintiff's primary physician, that Plaintiff's continued chiropractic adjustments and cervical spine manipulation were unfortunate given Plaintiff's January 2008 cervical fusion procedure. Id. at 761. Dr. Stanley advised that any further chiropractic treatment be limited to Plaintiff's thoracic-lumbar area, if Plaintiff felt it were necessary. Id.

On December 21, 2010, Plaintiff underwent EMG and nerve conduction study testing of the lower extremities. Tr. at 708-09. The testing showed electrophysiological evidence of diffuse and symmetric peripheral neuropathy,[10] and acute left L5 and S1 radiculapathy.[11] Id. at 709.

---

ideas, grandiosity, poor judgment, aggressiveness, and possible hostility." Id.

[8]Oxycodone, commonly marketed as Oxycontin, is indicated for the management of moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time. PDR 2009 at 2590.

[9]Ambien is indicated "for the short-term treatment of insomnia." PDR 2009 at 2962.

[10]Neuropathy is a functional disturbance or pathological change in the peripheral nervous system. DIMD at 1287.

[11] Radiculopathy is a disease of the nerve roots. DIMD at 1404.

6

On January 13, 2011, Dr. Stanley performed a posterior cervical fusion on Plaintiff to remedy a non-union and loosening of hardware from the January 2008 cervical discectomy, and to address her "progressive neck pain." Tr, at 710-12. The operative report gives identical pre-operation and post-operative diagnoses, namely "Nonunion cervical spine, status post anterior cervical discectomy and interbody fusion with neck pain and radiculopathy." Id. at 710. Surgery involved the placement of screws and the use of a bone graft. Id. at 712. On February 25, 2011, Dr. Stanley reported that Plaintiff's incision was "healing nicely," she had "improvement" in her neck pain, and that "[h]er only real complaint today is of knee pain." Id. at 759. The doctor concluded that Plaintiff "is going to remain at restricted activities as we follow healing." Id.

On March 2, 2011, Plaintiff was examined by Raymond Wolfe, M.D., an orthopedist, for complaints of bilateral knee pain. Tr, at 809. Plaintiff denied any catching, locking or giving way in her knees. Id. She exhibited normal station and gait, she exhibited no deformity, swelling, erythema or effusion, and her muscle tone, size and girth were "adequate and symmetric." Id. McMurray's test[12] was "markedly positive for pain over Plaintiff's left knee joint line, trace on the right." Id. The doctor ordered radiographic studies of Plaintiff's knees. Id. An MRI of Plaintiff's right knee taken on March 8, 2011, showed a tear of the posterior horn of the medial meniscus, mild degenerative joint disease (DJD), and a chronic partial tear of the anterior cruciate ligament. Id. at 812. An MRI of Plaintiff's left knee showed a small tear of the posterior

---

[12]McMurray's test is used to determine the presence of a meniscal tear in the knee. http://www.physio-pedia.com/McMurrays_Test (last visited February 4, 2013).

horn of the medial meniscus, mild DJD, and marrow changes to the medial compartment related either to injury or DJD. Id. at 814.

On March 4, 2011, Dr. Stanley completed a Physical RFC Questionnaire on behalf of Plaintiff. Tr. at 692-95. Dr. Stanley diagnosed Plaintiff with cervical spondylosis/disc herniation, non-union, with a prognosis of "fair." Id. at 692. The doctor opined that Plaintiff could sit and stand 15 minutes at a time, with sitting allowed for two hours in an eight-hour workday, and standing for less than two hours in an eight-hour workday. Id. at 694-95. The doctor found that Plaintiff could rarely lift or carry objects weighing even less than 10 pounds, could never look down or look up, rarely turn her head left or right or hold her head in a static position, never stoop or climb ladders, rarely twist, crouch or squat, and occasionally climb stairs. Id. Dr. Stanley noted that Plaintiff would need to take unscheduled breaks during the day and would require a job that permitted her to shift positions at will from sitting, standing or walking. Id. at 694. The doctor opined that Plaintiff's pain would frequently interfere with the attention and concentration needed to perform simple work tasks, and that she would likely be absent from work as a result of her impairments more than four days per month. Id. at 693, 695. Dr. Stanley did not assess Plaintiff's ability to cope with stress. Id. at 694. The doctor indicated that Plaintiff's impairments "lasted or can . . . be expected to last at least twelve months." Id. at 692.

On March 7, 2011, Dr. Goss, Plaintiff's chiropractor, also completed a Physical RFC Questionnaire on behalf of Plaintiff. Id. at 794-97. Dr. Goss diagnosed Plaintiff with cervicalgia, cervical spine dysfunction, thoracic spine issues, and multiple

8

subluxations,[13] with symptoms that included pain, numbness, and tingling down her left arm; pain in her neck, shoulder, and upper back; and headaches. Id. at 794. The chiropractor opined that Plaintiff could sit for 30 minutes at one time and stand for up to 20 minutes at one time, and sit, stand and walk less than two hours in an eight-hour workday. Id. at 796. Dr. Goss indicated that Plaintiff could rarely lift or carry objects weighing even less than 10 pounds; occasionally look up and down, turn her head left or right, or hold her head in a static position; rarely twist her torso or climb ladders; and occasionally stoop, crouch, squat or climb stairs. Id. at 796-97. The chiropractor found that Plaintiff was significantly limited in her ability to reach, handle and finger objects, indicating that she could perform these tasks no more than one-third of an eight-hour work day. Id. at 797. Dr. Goss characterized Plaintiff's pain as constant and ranging from sharp to a dull throb. Id. at 794. The chiropractor opined that Plaintiff's pain would frequently interfere with the attention and concentration needed to perform even simple work tasks, and would cause her likely be absent from work as a result of her impairments more than four days per month. Id. at 795, 797. Dr. Goss characterized Plaintiff's prognosis as "guarded, and indicated that Plaintiff's impairments "lasted or can . . . be expected to last at least twelve months." Id. at 794.

---

[13]Subluxations are incomplete or partial dislocations. DIMD at 1791.

## B.    Mental Health

Plaintiff has received mental health treatment since at least September 2006 and has a history of diagnoses for bipolar disorder,[14] post-traumatic stress disorder (PTSD), major depressive disorder, and panic disorder. See tr. at 380, 506, 517, 525, 762, 764, 818. During an initial psychological evaluation on September 1, 2006, Plaintiff was diagnosed with bipolar disorder and polysubstance abuse, and was assessed with a Global Assessment of Functioning (GAF) score of 55.[15] Id. at 518, 525.

On June 8, 2010, Alex Siegel, Ph.D., a state agency psychologist, reviewed Plaintiff's psychological record and completed both a Psychiatric Review Technique Form ("PRTF") and a Mental RFC assessment. Tr. at 625-28, 629-41. In the PRTF, Dr. Siegel listed Plaintiff's diagnoses as bipolar disorder,[16] and polysubtance dependence in remission. Id. at 632, 637. The doctor opined that Plaintiff had "moderate" difficulty maintaining social functioning and concentration, persistence or pace, "mild" restriction in activities of daily living, and no episodes of decompensation. Id. at 639. In the Mental

_____

[14]Bipolar disorder, or manic-depressive illness, is more accurately a group of disorders generally characterized by mild, moderate or severe episodes of manic, mixed or major depressive moods. Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000), ("DSM IV-TR"), at 382-383.

[15]The GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health. DSM IV-TR at 32. A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., no friends, conflict with peers or co-workers)." Id. at 34.

[16] Dr. Siegel diagnosed bipolar disorder, "NOS," Not Otherwise Specified, which includes disorders with bipolar features that do not meet criteria for any specific bipolar disorder. DSM IV-TR at 400.

10

RFC assessment, Dr. Siegel opined that Plaintiff was "moderately limited" in her ability to understand, remember and carry out detailed instructions; accept instructions and respond appropriately to criticism; get along with coworkers and peers; and respond appropriately to changes in the work setting. Id. at 625-26. Dr. Siegel further opined that Plaintiff was not significantly limited in all other categories. Id. at 625-26. Dr. Siegel concluded that Plaintiff could perform "simple, routine, repetitive work in a stable environment" and could function in production-oriented jobs requiring little independent decision-making. Id. at 627.

On March 11, 2011, Kai Qualls, Plaintiff's therapist at NHS Human Services, completed an Assessment of Mental Ability to Do Work-Related Activities. Id. at 816-18. Ms. Qualls assessed Plaintiff with "moderate" limitations in relating to peers, dealing with the public, and using judgment; "marked" limitations in maintaining attention and concentration and in her ability to be aware of hazards; and "extreme" limitation in dealing with stress. Id. at 816.[17] Ms. Qualls opined that Plaintiff's difficulty handling stress would lead her to "decompensate in a full time employment situation." Id. at 818. Ms. Qualls explained that Plaintiff's tendency to "fall apart" emotionally "combined with her angry/rage responses would make full-time employment difficult." Id.

---

[17]The form defines "Moderate" as "[a]bility to function in this area is limited but satisfactory, "Marked" as "[a]bility to function in this area is seriously limited, unsatisfactory, but not excluded, and "Extreme" as "[n]o useful ability to function in this area." Tr. at 816.

11

## C. Hearing Testimony and Other Evidence

In a function report dated May 18, 2010, Plaintiff described the daily activities she performed, including caring for her three-year old daughter from approximately 9:00 a.m. to 2:00 p.m., washing, laundry and cooking, and explained that other family members helped during the afternoon and evening hours. Tr. at 225-26. At the March 14, 2011 administrative hearing, Plaintiff testified that she underwent the January 2011 cervical fusion surgery because of pain attributable to screws from a prior surgery which had come loose. Tr. at 63. She stated that she could lift ten pounds prior to the January 2011 procedure, but that the pain worsened post-surgery and she could no longer lift more than five pounds. Id. at 63-66. Plaintiff stated that she has ached "all over" for the past three years prior to the hearing. Id. at 70. Plaintiff reported problems with reaching, grasping and holding onto items post-surgery. Id. at 79. Additionally, Plaintiff stated that she could not walk more than half a block or stand for more than four and a half minutes because of her knee problems. Id. at 66-67, 71. About twice per month she experiences petit mal seizures and also headaches that last all day and leave her "[w]iped out." Id. at 74-75. Plaintiff testified that she stopped using marijuana in the summer of 2010. Id. at 61.

In terms of her mental health, Plaintiff testified that she was diagnosed as bipolar. Tr. at 79. She cried during her administrative hearing and testified that she cried every morning. Id. Plaintiff also described mood swings where she yelled and occasionally threw things. Id. at 80. She does not go out alone. Id. at 80-81. Plaintiff stated that she

12

has trouble reading and following television programs from beginning to end because she gets sidetracked, and that she requires repeat instructions to complete tasks. Id.

The ALJ also obtained testimony from a vocational expert (VE). Tr. at 82-87. The VE characterized Plaintiff's past relevant work as a cashier as light and semi-skilled, deli clerk as light and semi-skilled but performed at the heavy exertional level, and office clerk/data entry clerk as sedentary and semi-skilled. Id. at 83. The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education and work experience; who was limited to light exertional work and could do no pushing or pulling with the upper extremities; who could never climb ladders, ropes or scaffolds, or do any balancing or crawling; who could only occasionally climb stairs, bend, kneel and crouch; who would have to avoid frequent exposure to hot and cold temperatures and other environmental conditions; and who would be limited to performing simple routine tasks with only occasional contact with supervisors and fellow employees and no contact with the public. Id. at 83-85. The VE opined that there were jobs in the economy that such a person could do, such as machine attendant work. Id. at 85. If the hypothetical person were further limited to sedentary exertional work, the VE stated that there would be unskilled sedentary occupations that such a person could perform, including unskilled inspector, system monitor or sedentary assembler. Id. If the hypothetical person frequently experienced pain severe enough to interfere with attention and concentration needed to perform even simple work, the VE opined that such a person could not perform competitive work. Id. at 86-87. Similarly, an inability to grasp or handle objects with the

13

upper extremities 25 percent of the time would compromise such a person's ability to

perform the identified jobs. Id. at 87.

## D.    ALJ's Opinion

In a decision dated April 15, 2010, the ALJ found as follows:

1.    At step one, the ALJ found that Plaintiff has not engaged in substantial
      gainful activity since August 25, 2006, her original alleged onset date. Tr.
      at 13.

2.    At step two, the ALJ found that Plaintiff has the following severe
      impairments: a cervical spine disorder, a seizure disorder, bilateral knee
      disorders, migraine headaches, asthma, and a bipolar disorder. Id.

3.    At step three, the ALJ found that Plaintiff does not have an impairment or
      combination of impairments that meet or medically equal one of the listed
      impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id.

4.    The ALJ determined that Plaintiff retains the RFC to perform the
      extertional demands of sedentary work, or work which is generally
      performed while sitting and never requires lifting in excess of ten pounds
      (20 C.F.R. § 404.1567). Id. at 18. The ALJ found that Plaintiff cannot
      push/pull with her upper extremities; can only occasionally bend, kneel,
      crouch or climb stairs, but can never climb ladders, ropes or scaffolds, or do
      any crawling and balancing; cannot reach overhead with either upper
      extremity; must avoid concentrated (frequent) exposure to temperature
      extremes, humidity, fumes, odors, gasses, and poor ventilation; must avoid
      all exposure to hazards such as moving machinery and unprotected heights;
      is limited to simple, routine tasks secondary to a moderate limitation in
      concentration, persistence and pace; and can have only occasional contact
      with supervisors and fellow employees, and no contact with the public. Id.

5.    At step four, the ALJ found that Plaintiff is unable to perform any past
      relevant work. Id. at 21.

6.    At step five, the ALJ found that, considering Plaintiff's age, education,
      work experience, and RFC, there are jobs which exist in significant
      numbers in the national economy that Plaintiff could perform, for example
      assembler, surveillance system monitor, and inspector. Id. at 21-22.

14

Accordingly, the ALJ concluded that Plaintiff has not been under a disability. Id. at 22-23.

Plaintiff alleges that the ALJ's decision is not supported by substantial evidence because the ALJ (1) improperly weighed the medical opinions of Dr. Stanley and Dr. Goss; (2) erroneously failed to include all of Plaintiff's impairments in his hypothetical questions to the VE, (3) failed to conduct a thorough inquiry into the types and levels of job stresses involved in the jobs identified by the VE, and (4) erroneously failed to fully credit Plaintiff's subjective complaints. See Doc. 10 at 15-19.[18] Defendant argues that the ALJ's decision is supported by substantial evidence. See Doc. 12.

## IV.  DISCUSSION

### A.  ALJ's Weighing of the Evidence

Plaintiff first argues that the ALJ's opinion is not supported by substantial evidence because the ALJ improperly weighed the medical opinions of Dr. Stanley and Dr. Goss. See Doc. 10 at 5-11. Defendant counters that this aspect of the ALJ's opinion is supported by substantial evidence. See Doc. 12 at 3-9.

"An ALJ should give 'treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 355 (3d Cir. 2008) (quoting Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)). A treating physician's opinion may be afforded "more or less weight depending upon the extent to which supporting explanations are provided." Id. (quoting Plummer v.

---

[18] Page references to the parties' briefs refer to the Court's ECF pagination.

Apfel, 186 F.3d 422, 429 (3d Cir. 1999)); see also S.S.R. 96-2p, "Policy Interpretation Ruling: Giving Controlling Weight to Treating Source Medical Opinions," 1996 WL 374188 (providing for controlling weight where treating physician opinion is well-supported by medical evidence and not inconsistent with other substantial evidence in record).

"An ALJ may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." Morales, 225 F.3d at 317-18 (quoting Plummer, 186 F.3d at 429). Moreover, "[a]lthough an ALJ may consider his own observations of the claimant . . . they alone do not . . . override the medical opinion of a treating physician that is supported by the record." Id. at 318. When the record contains contradictory probative evidence, "we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided." Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001).

Here, the ALJ discussed the medical evidence in part as follows:

> Regarding [Plaintiff's] physical impairments, the record shows that [Plaintiff] did relatively well after her first neck surgery in January 2008. . . . The current record shows that [Plaintiff] was apparently "dancing" until February 2009 and painting her new apartment in June 2009. In early 2010, [Plaintiff] was participating in flea markets and helping her fiancé's business. . . .
>
> [Plaintiff's] neck pain apparently became worse in late 2010; however, she again underwent surgery and it is reported [Plaintiff] was doing well with improvement in pain and paresthesias. Any increase in pain [Plaintiff] experienced at

16

the end of 2010 has not persisted for a 12 month period and
may not with continued treatment and medication.

\* \* \* \*

In this case, Dr. Stanley completed the [physical RFC]
assessment form shortly after [Plaintiff's] current surgery.
Although he assesses disabling limitations, his treatment
notes show that [Plaintiff's] activities are restricted "during
healing." A review of [Plaintiff's] activities during 2009 and
2010, do not support the extensive restrictions found by Dr.
Stanley and there is no reason to think that any increase in
severity right after the recent surgery will persist for a 12
month period. Thus, little weight can be given to this
assessment form.

Similarly, [Plaintiff's] chiropractor (like a therapist, not
considered an acceptable medical source) completed an
assessment form in March 2011 although she had apparently
not seen [Plaintiff] after July 2010. The limitations assessed
are not supported by her own records or the other longitudinal
records.

Tr. at 19-20 (citations to Exhibits omitted).

As an initial matter, Defendant argues that the RFC assessments made by Drs.

Stanley and Goss are mere "checkmark" assessments, and the RFC assessment of the

chiropractor is not entitled to weight because she is not a medical doctor. See Doc. 12 at

8. I disagree. The RFC assessments in question are not merely "check the box"

assessments, but rather include questions and answers and are accompanied by treatment

records. See tr. at 794-808. Moreover, although a chiropractor is not considered an

acceptable medical source for purposes of establishing a medically-determinable

impairment, see 20 C.F.R. § 404.1513, an adjudicator must consider the opinions of

health providers who are not considered "acceptable medical sources" on key issues such

17

as impairment severity and functional effects. See S.S.R. 06-03p, "Considering Opinions and Other Evidence From Sources Who are Not 'Acceptable Medical Sources' in Disability Claims", 2006 WL 2329939. Because Dr. Goss's report concerns these permissible areas, and because Plaintiff treated with Dr. Goss regularly over a multi-year period, Defendant's blanket dismissal of the chiropractor's assessment is not appropriate.

More importantly, this aspect of the ALJ's opinion is problematic in light of the fact that Plaintiff's cervical pain was characterized as "progressive" and deemed of sufficient severity to necessitate a cervical fusion surgery in January 2011 – fourteen months after Plaintiff's amended alleged onset date – to correct and improve upon a prior neck surgery performed in January 2008 by adjusting a prior screw, adding two additional screws, and conducting a bone graft. Tr. at 710. For example, Dr. Gupta diagnosed Plaintiff with cervical dystonia as early as December 2006, and her cervical-related pain was sufficient to warrant Myobloc injections of the upper trapezius muscles and bilateral subscapular areas in October 2009. Id. at 575. Upon examination and evaluation by Plaintiff's chiropractor in June 2010, Plaintiff exhibited "decreased and painful cervical range of motion in all directions worse on the left side." Tr. at 798. This evidence, together with Plaintiff's testimony, belies the suggestion that Plaintiff's neck-related pain worsened only "in late 2010."

In addition, the RFC assessments made by the surgeon, Dr. Stanley, and Plaintiff's chiropractor, Dr. Goss – the only such assessments in the record made post-surgery – are remarkably consistent with each other and largely substantiate Plaintiff's testimony regarding her limitations. For example, both medical sources opined that Plaintiff was

18

significantly limited regarding the time she could sit, stand or walk at one time or over an eight-hour workday. Tr. at 694-95, 795-96. Both opined that Plaintiff could rarely lift or carry objects weighing even less than 10 pounds. Id. at 694, 796. Both opined that Plaintiff's pain would frequently interfere with the attention and concentration needed to perform even simple work tasks. Id. at 693, 795. Both opined that Plaintiff would likely be absent from work as a result of her impairments more than four days per month. Id. Dr. Stanley further opined that Plaintiff could never look up or down, and rarely turn her head left or right or hold her head in a static position; Dr. Goss that Plaintiff could occasionally look up and down or hold her head in a static position. Id. at 694, 796.

Defendant argues that the ALJ properly gave the opinions of Drs. Stanley and Goss less weight because their RFC assessments were made only a few months post-surgery and, as the ALJ stated, "there is no reason to think that any increase in severity after the recent surgery will persist for a 12 month period." Tr. at 20. In addition to overlooking the undisputed evidence that Plaintiff's cervical pain worsened in the months *preceding* the second cervical fusion surgery, this statement is also inconsistent with the post-surgical assessments by Plaintiff's surgeon and chiropractor, both of whom opined that Plaintiff's limitations "lasted or can . . . be expected to last at least twelve months." Id. at 692, 794. It is noteworthy that Dr. Stanley is the same physician whose post-surgical notes regarding Plaintiff's improvement in pain and paresthesias are relied upon by the ALJ to suggest that Plaintiff's condition would improve. See id. at 19. It is also noteworthy that the ALJ discounted the disabling limitations assessed by Dr. Goss in part because she had apparently not seen Plaintiff since July 2010, even though an assessment

19

based on her condition at that time would undermine the ALJ's finding that Plaintiff's limitations did not significantly worsen until "late 2010." See id. at 20.

At the very least, the assessments made by Dr. Stanley and Dr. Goss are unclear as to the anticipated duration of Plaintiff's post-surgical pain and limitations. Indeed, the ALJ conceded as much when he stated that "[a]ny increase in pain that [Plaintiff] experienced at the end of 2010 has not persisted for a 12 month period *and may not* with continued treatment and medication." Tr. at 19 (emphasis added). The durational issue was a determinative factor in the ALJ's decision, together with a finding that these medical sources' opinions regarding Plaintiff's ability to perform work activity were not supported by their own treatment notes. As such, the ALJ should have re-contacted them for clarification of these matters. See 20 C.F.R. § 404.1512(e)(1) (providing additional evidence or clarification from medical source will be sought when report from medical source contains a conflict or ambiguity that must be resolved, report does not contain all necessary information, or does not appear to be based on medically acceptable diagnostic techniques); see also Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 205 (3d Cir. 2008) (responsibility to re-contact medical source only triggered if evidence from medical source is inadequate for making disability determination).

Accordingly, I find this aspect of the ALJ's opinion is not supported by substantial evidence. I therefore recommend that this matter be remanded so the ALJ may re-contact Plaintiff's surgeon, Dr. Stanley, and/or Plaintiff's chiropractor, Dr. Goss, for clarification of the bases and expected duration of Plaintiff's assessed limitations, and for updated RFC assessment(s), if deemed necessary.

## B. The ALJ's Hypothetical Questions Presented to the VE

Plaintiff next argues that the ALJ's opinion is not supported by substantial evidence because the ALJ erroneously failed to include all of Plaintiff's impairments in his hypothetical questions to the VE. See Doc. 10 at 12-13. Defendant counters that this aspect of the ALJ's opinion is supported by substantial evidence. See Doc. 12 at 9-10.

Testimony of a VE constitutes substantial evidence for purposes of judicial review where a hypothetical question considers all of a claimant's impairments which are supported by the record. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). The hypothetical must examine four essential factors: (1) claimant's age; (2) claimant's education: (3) claimant's past work experience; and (4) claimant's RFC. 20 C.F.R. 404.1505(a). "Hypotheticals are considered deficient when important factors are omitted or the claimant's limitations are not adequately portrayed." Emery v. Astrue, No. 07-cv-2482, 2008 WL 5272454, at *3 (E.D. Pa. Dec. 18, 2008) (Robreno, J.) (citing Podedworny v. Harris, 745 F.2d 210, 218 (3d Cir. 1984)).

Here, the ALJ found that Plaintiff had a severe cervical spine disorder, the record is replete with evidence of persistent neck-related pain and limitations, including injections and cervical fusion surgery in January 2008 and January 2011, and the previously discussed assessments of Plaintiff's surgeon and chiropractor contain significant limitations in Plaintiff's ability to look up and down, turn her head left or right, and hold her head in a static position. Id. at 694, 796. Restrictions and limitations related to neck mobility are what one would generally expect in patients with a history of cervical fusion surgeries and cervical dystonia, and they are consistent with Plaintiff's

21

self-reported symptoms of neck-related pain and limitations. The ALJ did not state that he was rejecting all evidence of limitations relating to Plaintiff's cervical spine condition. Nevertheless, the ALJ failed to ask the VE to consider any restrictions regarding neck mobility whatsoever.

Under the circumstances, it cannot be said that the ALJ's hypothetical questions to the VE adequately portrayed Plaintiff's neck-related limitations. Therefore, upon remand, I further recommend that the ALJ be directed to obtain additional VE testimony incorporating limitations attributable to Plaintiff's severe cervical spine disorder. [19]

## C.    Inquiry Into Types and Levels of Job Stresses Identified by the VE

Plaintiff next argues that the ALJ's opinion is not supported by substantial evidence because the ALJ failed to conduct a thorough inquiry into the types and levels of job stresses involved in the jobs identified by the VE. See Doc. 10 at 13-15. Defendant argues that the ALJ was not required to conduct such an inquiry and that Plaintiff's mental and stress issues were accommodated by the ALJ's RFC determination. See Doc. 12 at 10-12.

_____

[19]In addition, the chiropractor opined that Plaintiff was significantly limited in her ability to reach, handle and finger objects, indicating that she could perform these tasks no more than one-third of an eight-hour work day. Tr. at 797. Dr. Stanley's RFC assessment is ambiguous in this regard, in that he responded "yes" to ther question whether Plaintiff has significant limitations with reaching, handing and fingering, but then failed to identify the percentage of time she could perform these activities during a work day. Id. at 695. The ALJ did not include any such limitations in his hypothetical to the VE, but following a question from Plaintiff's counsel, the VE stated that an inability to grasp or handle objects with the upper extremities 25 percent of the time would compromise such a person's ability to perform the jobs identified by the VE. Id. at 87. Upon remand, the ALJ is further required to seek clarification whether Plaintiff is limited in these areas and to what degree.

22

The ALJ found that Plaintiff's severe conditions included bipolar disorder. Tr. at

13. In discussing evidence of Plaintiff's mental impairment in the context of his step

three determination, the ALJ stated the following in part:

> The medical evidence shows that [Plaintiff] has been treated
> with medication and therapy since at least September 2006.
> At the time of the initial psychological evaluation, [Plaintiff]
> was diagnosed with a bipolar disorder and . . . [GAF] score as
> 55-60 . . . . The current records show that [Plaintiff] is
> "stable," helping in her fiancé's business and considering a
> job offer.
>
> * * * *
>
> In assessing [Plaintiff's] functional limitations . . . the
> undersigned has given great weight to the assessment of the
> State agency psychological consultant who found that
> [Plaintiff] has no more than moderate psychological
> limitations. Findings of fact made by State agency medical
> and psychological consultants . . . regarding the nature and
> severity of an individual's impairments are treated as expert
> opinion evidence of nonexamining sources (SSR 96-6p).
> Although the State agency psychological consultant did not
> examine [Plaintiff], he provided specific reasons for his
> opinions about [Plaintiff's] limitations showing that they were
> well grounded in the evidence of record. The current records,
> submitted after the State agency assessment, do not support
> more than moderate limitations.
>
> In assessing [Plaintiff's] [RFC], the undersigned has also
> considered the assessment form completed by [Plaintiff's]
> therapist, Kai Qualls. Although a therapist is not considered
> an acceptable medical source, the regulations provide that an
> [ALJ] may use information from a therapist to help
> understand how a claimant's impairment affects her ability to
> work (20 C.F.R. 404.1513(e)(3)).
>
> In this case, Ms. Qualls began treating [Plaintiff] in
> November 2010. She finds that [Plaintiff] would have
> "marked" limitations in her ability to relate predictably in
> social situations, maintain attention/concentration, and be

23

> aware of hazards; and "extreme" limitations in her ability to
> deal with stress. However, the current records show that
> [Plaintiff] is stable, helping in her fiancé's business, and
> considering a job offer. The undersigned sees nothing in the
> record that would support marked psychological limitations
> when [Plaintiff] is compliant with treatment. Little weight
> can be given to this assessment.

Tr. at 16 (citations to exhibits omitted). As a result, the ALJ gave great weight to the

opinions of Dr. Siegel, the state agency psychological consultant, and little weight to the

opinions of Ms. Qualls, Plaintiff's treating therapist. Id. at 16, 22.

The ALJ's consideration of Plaintiff's mental limitations does not pose the same

level of concern as did his consideration of her physical limitations. As the ALJ noted,

Ms. Qualls' assessment that Plaintiff has "extreme" limitations in her ability to deal with

stress is not supported by the record. Plaintiff has been assessed with GAF scores

indicating moderate symptoms. Tr. at 506, 525 (scores of 55). Plaintiff has no history of

decompensation. Id. at 639. When evaluated in March 2010, Plaintiff identified her

stressors as relationship and communication conflicts with her fiancé, whom she planned

to marry later in the year. Id. at 310, 380. Dr. Siegel, the state agency psychologist,

reviewed Plaintiff's psychological evidence, opined that she had no more that moderate

psychological limitations, and concluded that she could perform "simple, routine,

repetitive work in a stable environment." Id. at 627. Plaintiff's chiropractor, Dr. Goss,

opined that Plaintiff was "capable of low stress" jobs, but conceded that she was "unable

to determine the full extent of emotional work stress." Id. at 795. Plaintiff's surgeon, Dr.

Stanley, explicitly declined to assess Plaintiff's ability to cope with stress. Id. at 694.

In sum, the record does not demonstrate that Plaintiff is incapable of low-stress work, and any limitations in this regard were accommodated by the ALJ's RFC determination and hypothetical limiting Plaintiff to simple, routine tasks secondary to a moderate limitation in concentration, persistence and pace, occasional contact with supervisors and fellow employees, and no contact with the public. Therefore, I find that this aspect of the ALJ's opinion is supported by substantial evidence.

**D.    Plaintiff's Subjective Complaints**

Lastly, Plaintiff argues that the ALJ's opinion is not supported by substantial evidence because the ALJ failed to fully credit Plaintiff's subjective complaints. See Doc. 10 at 15-19. Defendant argues that this aspect of the ALJ's decision is supported by substantial evidence. See Doc. 12 at 12-13.

Social Security Regulations require a two-step evaluation of subjective symptoms: (1) a determination as to whether there is objective evidence of a medically determinable impairment that could reasonably be expected to produce the symptoms alleged; and (2) an evaluation of the intensity and persistence of the pain or symptoms and the extent to which it affects the individual's ability to work. 20 C.F.R. § 404.1529(b). Similarly, the ALJ is required to consider both the objective evidence of record as well as Plaintiff's subjective testimony. See S.S.R. 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements," 1996 WL 374186. Even when the medical record does not confirm or support a claimant's subjective complaints, the ALJ is required to give them serious consideration. See Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981). The ALJ is required to explain why he or she is rejecting such

25

complaints with references to the medical record. See Hartranft v. Apfel, 181 F.3d 358, 361 (3d Cir. 1990) (citing 20 C.F.R. § 404.1529).

Here, after discussing Plaintiff's medical record and perceived inconsistencies in Plaintiff's testimony regarding her daily activities, the ALJ found that Plaintiff's "subjective complaints regarding the severity of limitations caused by her impairments are considered not fully credible and not supported by the medical evidence." Tr. at 20. As previously discussed, I recommend that this matter be remanded so the ALJ may re-contact Plaintiff's surgeon, Dr. Stanley, and/or Plaintiff's chiropractor, Dr. Goss, for clarification of the bases and expected duration of Plaintiff's assessed limitations; for updated RFC assessment(s), if deemed necessary; and for additional VE testimony incorporating limitations attributable to Plaintiff's severe cervical spine disorder. Because evidence obtained on remand may affect any credibility determination, I decline to further address this issue at this time.

For the foregoing reasons, I make the following:

## RECOMMENDATION

AND NOW, this 25Th day of February 2013, it is RESPECTFULLY

RECOMMENDED that the case be remanded to the Commissioner pursuant to sentence

four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report, Judgment

be entered REVERSING the decision of the Commissioner of Social Security for the

purposes of this remand only, and the relief sought by Plaintiff be GRANTED to the

extent that the matter be REMANDED for further proceedings consistent with this

adjudication. The parties may file objections to this Report and Recommendation. See

Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any

appellate rights.

**ENTERED**

BY THE COURT:

FEB **2 6** 2013

**CLERK OF COURT**

ELIZABETH T. HEY
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| KARLA KNORR | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. ASTRUE | : | NO. 11-7324 |

AND NOW, this       day of           , 2013, upon careful and

independent consideration, the record reveals that the Commissioner did not apply correct

legal standards and that the record does not contain substantial evidence to support the

ALJ's findings of fact and conclusions of law. As a result, this action must be remanded

to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g). Therefore, it is

hereby ORDERED that:

1.      The Report and Recommendation is APPROVED AND ADOPTED;

2.      Judgment is entered REVERSING the decision of the Commissioner of
Social Security for the purposes of this remand only and the relief sought
by Plaintiff is GRANTED to the extent that the matter is REMANDED for
further proceedings consistent with this adjudication;

3.      The Clerk of Court is hereby directed to mark this case closed.

BY THE COURT:

_____
PAUL S. DIAMOND, J.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

2/26/2013

RE:   Knorr vs Astrure
         CA No. 11-7324

## NOTICE

Enclosed herewith please find a copy of the Report and Recommendation filed by United States Magistrate Judge Hey, on this date in the above captioned matter. You are hereby notified that within fourteen (14) days from the date of service of this Notice of the filing of the Report and Recommendation of the United States Magistrate Judge, any party may file (in duplicate) with the clerk and serve upon all other parties written objections thereto (See Local Civil Rule 72.1 IV (b)). **Failure of a party to file timely objections to the Report & Recommendation shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court Judge.**

In accordance with 28 U.S.C. §636(b)(1)(B), the judge to whom the case is assigned will make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. The judge may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge, receive further evidence or recommit the matter to the magistrate judge with instructions.

Where the magistrate judge has been appointed as special master under F.R.Civ.P 53, the procedure under that rule shall be followed.

MICHAEL E. KUNZ
Clerk of Court

By: _____
Joseph Lavin, Deputy Clerk

cc:   M. Littman
        M. Boyle
        R. Drum

        Courtroom Deputy to Judge Diamond

civ623.frm
(11/07)